JANE DOE, for Herself and as Next Friend of Betty Doe, her Minor Daughter and John Doe, her Minor Son, Plaintiffs-Appellants, v. CALUMET CITY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—90—1121

Opinion filed November 23, 1992.—Rehearing denied March 9, 1993.

MANNING, J., dissenting.

Edward T. Stein, Clifford Zimmerman, and Nottage & Ward, all of Chicago (Eunice Ward, of counsel), for appellants.

Segal, McCambridge, Singer & Mahoney, of Chicago (Gregory E. Rogus and Paul E. Wojcecki, of counsel), for appellee City of Calumet City.

Baal & O'Connor, of Chicago (Robert B. Baal and Keith R. Haug, of counsel), for appellees James Horka, Daniel Surufka, and Kevin Beasley.

Ancel, Glink, Diamond & Cope, P.C., of Chicago (David Lincoln Ader, Thomas G. DiCianni, and Teri Engler Kliejunas, of counsel), for appellees Village of Burnham and Gregory Giglio.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs, Jane Doe, individually, and on behalf of her minor children Betty and John Doe, appeal from the order of the circuit court of Cook County dismissing counts I through IV and count VIII of their first amended complaint brought against defendants Calumet City and James Horka, Daniel Surufka, and Kevin Beasley, Calumet City police officers; and the Village of Burnham and Gregory Giglio, a Burnham police officer, for injuries sustained by Jane Doe and her minor children during a home invasion. Counts V through VII relate only to defendant Valentine and remain pending. On appeal, plaintiffs contend that: (1) the trial court erred in finding no "special relationship" existed between plaintiffs Betty and John Doe and defendant police officers; (2) the trial court erred in determining that plaintiffs did not adequately plead gender-based discrimination claims against defendants Officer Horka and Calumet City; and (3) the trial court erred in determining that plaintiffs did not adequately plead a cause of action for intentional infliction of emotional distress. For the following reasons, we affirm the judgment of the trial court.

The record sets forth the following facts relevant to this appeal. Plaintiffs' complaint charged that on December 20, 1987, at approximately 4:30 a.m., defendant Benjamin Valentine illegally entered the apartment of Jane, Betty and John Doe at 278 Yates Street, Calumet City, Illinois. Valentine entered the bedroom where all three Does were sleeping, and climbed on top of Jane Doe. He grabbed her clothing and began feeling her breasts and genital area, declaring he would rape her and threatening to kill her. Jane begged Valentine not to do anything with her children present. Valentine got off Jane and directed Betty and John to leave the room. Valentine followed the children out while threatening to kill them. Jane ran to the front door of the apartment. Valentine followed and caught Jane and they fell down the stairs. Valentine struck Jane and again threatened to kill her. Jane grabbed the stair railing and would not let go. Valentine turned around and reentered the apartment, locking the door behind him.

Jane Doe tried to reenter the apartment by kicking and pushing the door. As she was unable to awaken anyone in her building, Jane left the building screaming for help. At that time, she was clothed only in underwear and had no shoes or socks on her feet. Several

neighbors heard Jane Doe's cries and called 911. Jane Doe ran to the building next door and pushed all the apartment buzzers.

In response to the 911 call, several municipalities dispatched police officers to the scene in Calumet City. Defendant Giglio, a Village of Burnham police officer, arrived shortly before defendant Horka of the Calumet police department. Horka arrived at approximately 4:39 a.m. and assumed a supervisory role, stating that he was in charge of the scene, maintaining control of the scene, the building and all persons in the area, giving instructions and orders to the other officers at the scene. Specifically, Horka talked to Jane Doe and ordered her to stay out of the building.

Horka asked Jane Doe if she had keys to her apartment and she replied that she did not. Horka also asked Jane: "Where is your husband?"; "Do you know the guy?"; "Why would you leave your children in the apartment if there was a strange man there?"; and "Why did you leave your apartment without the key?" Upon direction of one or more of the defendants, the landlord, who lived in South Holland, Illinois, was telephoned and requested to bring keys to the building.

Plaintiffs alleged that when Horka spoke to other officers, he described Jane Doe as "an hysterical woman," and said "this girl is freaking out," and "she's not coherent anymore." The complaint alleges that Horka's tone of voice was rude, demeaning and accusatory.

Horka checked the front door and rang several apartment buzzers but received no response. Horka and Giglio walked around to the rear of the building, allegedly checking the windows and rear door.

Horka assigned Giglio to stay at the back door to secure the area. Jane Doe begged Horka to break down the door, but Horka responded that he would not break down the door because he did not want to be responsible for property damage. Horka prevented Jane Doe and her neighbors from their attempts to break down the door or otherwise enter the apartment.

Defendant Surufka arrived and discussed the situation with Horka, but did not attempt to enter the premises. Horka shined a spotlight into the apartment. Defendant Beasley then arrived and Horka stationed him and additional Chicago police officers at different points around the building. Defendants Beasley and Surufka tapped on windows and rang doorbells to the building.

Horka spoke by radio with his supervisor, Sergeant Targonski. During this conversation, Sergeant Targonski directed Horka to break down the apartment door. Horka did not do so.

Several paramedics arrived and consulted with Horka. One or more of the paramedics told Horka and other defendants that a "lock

pick," locksmith and ladder were all available to gain entry into the apartment. Horka told the paramedics not to interfere and that Horka himself would make the decisions regarding the situation. No effort was made to utilize the "lock pick," locksmith or ladder.

At approximately 5 a.m., Investigator Miller of the Calumet City police department arrived, and spoke with Jane Doe. Miller went around to the rear of the building and entered the apartment through the rear door of the building and the back door of the apartment, which were both unlocked. When Investigator Miller entered the apartment, he found Valentine raping Betty Doe. During the time Valentine was in the apartment, Valentine had threatened and choked John Doe.

Count I of plaintiffs' amended complaint alleges that the defendants assumed a "special relationship" to Betty and John Doe when they became aware of the facts and circumstances surrounding Valentine's intrusion and sexual assault of Jane Doe. Plaintiffs allege that defendants had a duty to enter the apartment to prevent injury to Jane Doe's children, and that defendants willfully and wantonly breached this duty when they did not enter the apartment. Counts II and III, based on the same theory of recovery, were brought on behalf of Jane Doe for loss of society and for medical expenses under the family expense act, respectively. Plaintiffs ultimately withdrew count II.

Count IV alleges that defendants Horka and Calumet City engaged in gender-based discrimination by defendant Horka's conduct toward Jane Doe during the incident and defendant Calumet City's ratification of such conduct.

In count VIII, all plaintiffs seek recovery for intentional infliction of emotional distress against defendants Horka and Calumet City on the grounds that defendants' conduct was extreme and outrageous and caused Jane severe emotional distress.

Defendants filed section 2—615 (Ill. Rev. Stat. 1991, ch. 110, par. 2—615) motions to dismiss plaintiffs' complaint on the grounds that: (1) section 4—102 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1991, ch. 85, par. 4—102) provided immunity for the municipalities and the individual officers in the absence of a special duty owed to plaintiffs, and that plaintiffs failed to allege a special duty; (2) plaintiffs failed to state a cause of action against Horka and Calumet City for gender-based discrimination; and (3) plaintiffs failed to state a cause of action against Horka and Calumet City for intentional infliction of emotional distress.

Following a hearing on the motions, the trial court granted defendants' motions to dismiss with prejudice. Plaintiffs' timely appeal followed.

Preliminarily, this is an appeal from a dismissal pursuant to section 2—615, which allows a court to dismiss actions based on the pleadings. A trial court should dismiss a cause of action on the pleadings only if it is clearly apparent that no set of acts can be proven which will entitle a plaintiff to recover. (*Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 504, 565 N.E.2d 654, 657.) On appeal, all well-pleaded facts in the attacked portions of the complaint are taken as true and this court must decide whether the allegations, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Burdinie*, 139 Ill. 2d at 505, 565 N.E.2d at 657.

Plaintiffs initially allege that defendants assumed a "special relationship" to Betty and John Doe when they became aware through Jane Doe that Betty and John were locked in Jane Doe's apartment with Valentine, an intruder and potential rapist. The complaint alleges that defendants "willfully and wantonly" failed to enter Jane Doe's apartment, thereby allowing Valentine to rape Betty Doe. Plaintiffs contend that count I states a cause of action under the "special duty" exception to the general rule that municipalities are not liable for failure to exercise police powers.

To overcome a motion to dismiss, plaintiffs must assert facts supporting the allegations of the cause of action; in other words, plaintiffs must allege facts which establish a duty, breach of that duty, and resulting injury. (*Anthony v. City of Chicago* (1988), 168 Ill. App. 3d 733, 735-36, 523 N.E.2d 22; *Bell v. Midlothian* (1980), 90 Ill. App. 3d 967, 969, 414 N.E.2d 104.) Plaintiffs contend the trial court erred in dismissing counts I through III of their complaint.

A municipality or its employees may not be held liable for failure to supply general police or fire protection. (*Burdinie*, 139 Ill. 2d at 520; *Huey v. Town of Cicero* (1968), 41 Ill. 2d 361, 363, 243 N.E.2d 214; Ill. Rev. Stat. 1987, ch. 85, pars. 5—102, 5—103.) This rule rests upon a public policy consideration and "embodies the conclusion that a police department's negligence—its oversights, blunders, omissions—is not the proximate or legal cause of harms committed by others." (*Marvin v. Chicago Transit Authority* (1983), 113 Ill. App. 3d 172, 176, 446 N.E.2d 1183; *Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 410 N.E.2d 610.) Where a public employee, however, exercises care or custody over an individual, the individual's status is elevated beyond that of a member of the general public, the "special

duty" exception is activated and the employee is liable for injury proximately caused by his negligence. *Burdinie*, 139 Ill. 2d at 508; *Huey*, 41 Ill. 2d at 363; *Anthony*, 168 Ill. App. 3d at 736; *Fessler v. R.E.J. Inc.* (1987), 161 Ill. App. 3d 290, 295, 514 N.E.2d 515; *Santy v. Bresee* (1984), 129 Ill. App. 3d 658, 662, 473 N.E.2d 69; *Gardner v. Village of Chicago Ridge* (1966), 71 Ill. App. 2d 373, 378-79, 219 N.E.2d 147, *aff'd in part, rev'd in part and remanded* (1970), 128 Ill. App. 2d 157, 262 N.E.2d 829, *cert. denied* (1971), 403 U.S. 919, 29 L. Ed. 2d 696, 91 S. Ct. 2230.

■ The general requirements of the "special duty" exception, whereby the police owe a special duty to an individual, as contrasted to the public at large, are as follows: (1) the municipality must be uniquely aware of the particular danger or risk to which plaintiff is exposed; (2) there must be allegations of specific acts or omissions on the part of the municipality; (3) the specific acts or omissions must be either affirmative or willful in nature; and (4) the injury must occur while the plaintiff is under the direct and immediate control of employees or agents of the municipality. *Burdinie*, 139 Ill. 2d at 508; *Anthony*, 168 Ill. App. 3d at 737; *Bell*, 90 Ill. App. 3d at 970; *Marvin*, 113 Ill. App. 3d at 176; *Curtis v. County of Cook* (1982), 109 Ill. App. 3d 400, 407, 440 N.E.2d 942.

The cases relied on by plaintiffs are factually distinguishable from the present case and therefore unpersuasive. Plaintiffs first rely on *Gardner v. Chicago Ridge*. In *Gardner*, police apprehended suspects who had attacked the plaintiff and requested that the plaintiff assist in identifying the suspects. The plaintiff accompanied police officers to where the suspects were being held, whereupon plaintiff was beaten again in the presence of the police officers. The court reversed the dismissal of plaintiff's complaint because the plaintiff had been "called into a position of peril" by the police. *Gardner*, 71 Ill. App. 3d at 380.

Similarly, in *Brooks v. Lundeen* (1977), 49 Ill. App. 3d 1, 364 N.E.2d 423, plaintiff motorist approached a police roadblock set up in the path of a car police knew was approaching at a very high speed. Police directed plaintiff to park on the side of the road, without giving him a reason for doing so, or warning him of the danger, and plaintiff was hit and killed by the speeding motorist. The court found a special relationship had been created between the parties and held the police liable for directing the plaintiff to remain in an area they knew was dangerous without warning him of the approaching, speeding car. *Brooks*, 49 Ill. App. 3d at 7.

Finally, in *Anthony v. City of Chicago*, a civilian was injured when city firefighters directed him to assist in opening an elevator door from which smoke was escaping in a burning building, knowing that Anthony was neither properly trained nor equipped for such assistance, and failing to warn him of the elevator's dangerous condition. The court held that the plaintiff sufficiently alleged that he acted under the direct and immediate control of the fire department because defendants' affirmative acts created a position of peril for the plaintiff.

Plaintiffs contend that the present case is similar to these cases if "direct and immediate control" is given a new interpretation. Plaintiffs argue that the proper standard for the fourth element of the special relationship test is whether or not the defendants "maintained and preserved control of the entire situation such that the injury could occur." However, plaintiffs fail to cite any authority for their proposition.

In the present case, the trial court found that while the amended complaint satisfies the first three requirements, plaintiffs made no allegations which lead to the conclusion that Betty and John Doe were injured while they were under the direct and immediate control of the Calumet City or Burnham village police officers. Plaintiffs' allegation that "JANE and several neighbors *believed* they were prevented from helping JANE's children because of the orders and actions of the police" (emphasis added) goes only to the state of mind of Jane Doe and the neighbors and does not meet this latter requirement.

The present case is more similar to *Galuszynski v. City of Chicago* (1985), 131 Ill. App. 3d 505, 475 N.E.2d 960. There, police failed to respond to a 911 call for 24 minutes during which time plaintiffs' residence was burglarized and plaintiffs were injured. The court held the police did not call plaintiffs into a position of peril creating a special duty; rather, the police simply failed to provide police protection. *Galuszynski*, 131 Ill. App. 3d at 508.

■ Plaintiffs here were neither affirmatively directed nor "called into a position of peril by the police." Plaintiffs' complaint fails to allege facts which show that Betty and John Doe were under the direct and immediate control of the police at the time their injuries occurred. Betty and John Doe were in Jane Doe's apartment with Valentine when the police arrived at the scene. The police officers did not have direct or immediate control over Valentine or over what was occurring in Jane Doe's apartment when they reached the scene, nor at any time during the incident, nor were they aware of exactly what was happening inside the apartment. Plaintiffs do not adequately

allege that the police officers exacerbated the situation through their awareness of the dangers of the situation. Any harm occurring to Betty and John Doe by Valentine while the police were outside the apartment determining their method of action cannot have been proximately caused by the police.

The dissent's reliance upon *Burdinie v. Village of Glendale Heights* is misplaced. The dissent quotes the supreme court out of context, thereby misinterpreting the meaning of the court's opinion. In that case, the court found no duty on the part of the defendant municipality under the "special duty" exception for injuries incurred by a plaintiff who jumped into a pool at the direction of a village swimming instructor. The court found that the third and fourth requirements of the test had not been satisfied in that case. Addressing the fourth requirement of "direct and immediate control," the court explained in full:

> "The situations which have satisfied the fourth part of the test have all involved police or fire protection. (See, *e.g., Anthony*, 168 Ill. App. 3d at 737; *Gardner*, 71 Ill. App. 2d at 379; *Brooks*, 49 Ill. App. 3d at 6-7.) Police and fire departments are paramilitary organizations. The very essence of their duties is to be cloaked in State authority, making refusal to obey an order or suggestion a difficult proposition in the mind of a private citizen. There is a tremendous qualitative difference between following a police officer's command and following a municipal recreational program instructor's command.
>
> With this in mind, we note that the appellate court has stated that the fourth test requirement is met where the public employee *creates a position of peril* ultimately injurious to a plaintiff, as opposed to situations where a plaintiff merely seeks protection from the public employee that is not normally provided. (*Anthony*, 168 Ill. App. 3d at 737; [citation].) *We interpret this to mean that the control element arises when the public employee initiates the circumstances which create the dangerous situation. Thus, where a police officer or firefighter initiates the dangerous situation without any suggestion from the plaintiff, it has been held that the plaintiff is under the control of the police or fire department.* (*Anthony*, 168 Ill. App. 3d at 737; *Brooks*, 49 Ill. App. 3d at 6-7; *Gardner*, 71 Ill. App. 2d at 379.) *However, where the plaintiff initiates the contact with the municipal employee, it has been held that the plaintiff is not under the direct or immediate control of the municipality.* [Citations.]

Thus, it has been held that a person is under the direct and immediate control of a municipality if a municipal employee who is acting with official authority which private citizens would reasonably believe they cannot refuse (such as a police officer's authority) makes a request of the private citizen and the citizen complies with the request. *Where a private citizen asks the municipal employee to perform a task, and the employee performs the task so as to injure the citizen, the citizen cannot claim he was under the municipality's direct or immediate control.*" (Emphasis added.) (*Burdinie,* 139 Ill. 2d at 525-26.)

We do not believe that *Burdinie* supports the conclusion that the requirement of "direct and immediate control" has been fulfilled in this case.

Plaintiffs' further contention that the defendants' conduct was willful and wanton in reliance on *Barth v. Board of Education* (1986), 141 Ill. App. 3d 266, 490 N.E.2d 77, is misplaced. There, an 11-year-old plaintiff received a head injury in the school yard and was taken to the principal's office, where school officials called the plaintiff's mother. The plaintiff's mother directed the school officials to take the injured child to the hospital. The school officials called 911, but made no effort to take the plaintiff to the hospital, which was directly across the street from the school. Plaintiff was not transported to the hospital for another hour, and as a result, suffered irreparable brain damage. In determining the city's liability for the 911 dispatcher's negligence, the court found the Tort Immunity Act and the four-part "special relationship" test inapplicable to the city's 911 emergency system because it is not a police protection service. The court, instead, found the city liable under the standard of "willful and wanton misconduct" in section 15.1 of the 911 act (Ill. Rev. Stat. 1983, ch. 134, par. 45.1). (*Barth,* 141 Ill. App. 3d at 279.) The 911 act is not relevant to the present case.

Next, plaintiff Jane Doe contends on her own behalf that Horka engaged in department-supported gender-based discrimination through his questioning of her at the scene. Jane Doe argues that Horka treated her differently than he would have treated a male in the same situation in that the questions he asked her ("Where is your husband?"; "Do you know the guy?"; "Why would you leave your children in the apartment if there was a strange man there?"; and "Why did you leave your apartment without the key?"), and the comments he made (he described Jane Doe as "an hysterical woman," and said "this girl is freaking out," and "she's not coherent anymore") were

rooted in gender-based stereotypes of females. Jane Doe claims a violation of her fourteenth amendment equal protection rights under 42 U.S.C. §1983 (1988). The trial court dismissed Jane Doe's equal protection claim for failure to show gender-based discrimination or to plead the existence of a department policy of discrimination.

To sustain an action under section 1983, a plaintiff must allege (1) deprivation of a constitutional right and (2) that the constitutional deprivation was caused by a government official acting in accordance with a municipal policy or custom. (*City of Oklahoma City v. Tuttle* (1985), 471 U.S. 808, 85 L. Ed. 2d 791, 105 S. Ct. 2427; *Monell v. Department of Social Services* (1978), 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018; *Jackson v. City of Chicago* (N.D. Ill. 1986), 645 F. Supp. 926.) Alleging one specific incident of constitutional deprivation and generally alleging that the deprivation resulted from a custom or policy does not constitute adequate pleadings; a plaintiff must allege a specific pattern or series of incidents that support the general allegations. (*Jackson*, 645 F. Supp. at 927.) Because this is an equal protection claim and there is no general constitutional right to police protection (*Hawk v. Perillo* (N.D. Ill. 1985), 642 F. Supp. 380, 384; *Lowers v. City of Streator* (N.D. Ill. 1985), 627 F. Supp. 244, 246), the plaintiff must demonstrate that she was treated differently because of her membership in a certain class. (*Watson v. City of Kansas City* (10th Cir. 1988), 857 F.2d 690, 694.) An equal protection plaintiff need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class is by itself enough. *Bohen v. City of East Chicago* (7th Cir. 1986), 799 F.2d 1180, 1187.

Jane Doe relies on a number of cases to support the contention that defendants discriminated against her. Each case is distinguishable on the facts. In reliance on *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775, Jane Doe first contends that the questions and comments at issue are the product of sex stereotyping. There, the plaintiff proved that gender-based comments in her employment file that she should take "a course in charm school," should not use foul language because "[she's] a lady," and that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry," contributed to her denial of partnership. In finding that the defendant engaged in sex stereotyping, the court held:

> "Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer

actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part. *** Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision of Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked evaluations." *Price Waterhouse*, 490 U.S. at 251, 104 L. Ed. 2d at 288, 109 S. Ct. at 1791.

In the present case, Jane Doe asserts that if Horka acted based on preconceived beliefs about women, then sex stereotyping occurred, and that the questions are sufficient evidence to show sex stereotyping. However, Jane Doe has not alleged facts supporting her contention that defendant Horka's questions and comments were based on preconceived beliefs about women, and that defendants in no way disclaimed that these comments were sex-linked, as did the plaintiff, Hopkins, in the above case. Jane Doe has alleged no facts showing that Horka had a pattern of asking these specific questions of women nor that he would not have put the same questions to a man in the same predicament, as the trial court stated, *e.g.*, "Where's your wife?" Do you know the guy?" "Why would you leave your children?" The trial court held it was more likely that defendant Horka's questions were an attempt to determine if he had a domestic situation and how he should proceed. We agree. Horka's comments that Jane Doe was "hysterical" and that she was not coherent similarly fail to indicate a pattern of gender-based discrimination.

Jane Doe's further reliance on *Watson v. City of Kansas City* and *Lowers v. City of Streator* is misplaced. In *Watson*, the plaintiff claimed that an unwritten policy or custom of the Kansas City police department allowed officers to respond differently to victims of domestic violence. In support, plaintiff offered evidence showing that out of 608 nondomestic assault cases where there was a known perpetrator, there were 186 arrests for an arrest rate of 31%. Out of 369 domestic assaults, there were only 69 arrests for a rate of 16%. *Watson*, 857 F.2d at 695.

In *Lowers*, the plaintiff was raped and reported the incident to the police. The plaintiff identified the rapist from police photographs and defendant police officers investigated the scene of the crime. One police officer defendant warned the plaintiff that the rapist would return and repeat the crime. Thereafter, defendants took no action to make a record of the incident, nor to apprehend the rapist, and the

plaintiff was raped again by the same man. The rapist was arrested and pled guilty to both rapes. (*Lowers*, 627 F. Supp. at 245.) The court found a special relationship between the plaintiff and the police officers and that plaintiff stated a cause of action for denial of protective services. The court held that the plaintiff's complaint sufficiently alleged a cause of action for denial of equal protection because plaintiff submitted evidence of a pattern of activity over a six-month period indicating a deliberate indifference on the part of the defendant city toward the prosecution of violent crimes against women. *Lowers*, 627 F. Supp. at 246-47.

Neither *Watson* nor *Lowers* supports Jane Doe's contention. Although Jane Doe argues that she need not show a policy of discrimination, in both of the above cases plaintiffs alleged statistical evidence or a pattern of activity showing that the police department defendants allowed officers to respond differently to female victims of certain crimes. Further, the *Lowers* court found a special relationship between the plaintiff and defendant police officers which is not present here.

Jane Doe argues, in the alternative, that if a municipal policy, practice or custom must be shown, the practices and customs of the Calumet City police department support a claim of gender-based discrimination. Jane Doe contends that a municipality may be liable when more than one incident of discrimination evidences the existence of a policy, practice or custom. (*Tuttle*, 471 U.S. at 821, 85 L. Ed. 2d at 802-03, 105 S. Ct. at 2435.) In support, Jane Doe submitted evidence of a Calumet City police department policy of strip searching female arrestees held unconstitutional by the United States District Court for the Northern District of Illinois. See *Doe v. Calumet City* (N.D. Ill. December 12, 1990), No. 87–3594, Memorandum Opinion and Order.[1]

However, defendants argue that the policy Jane Doe seeks to rely upon is far removed from the constitutional deprivation alleged: "At the very least there must be an affirmative link between the policy and the particular violation alleged." (*Tuttle*, 471 U.S. at 823, 85 L. Ed. 2d at 804, 105 S. Ct. at 2436.) A department policy related to the strip searches of female arrestees is unrelated to an alleged department practice of asking discriminating questions of women at the scene of a home invasion. Jane Doe has shown no link between the

---

[1] Jane Doe in the Federal district case is not the same Jane Doe in the present case.

policy and the alleged constitutional deprivation and has thus failed to substantiate a claim for gender-based discrimination against Calumet City.

Finally, all plaintiffs contend the trial court erred in rejecting their claim of intentional infliction of emotional distress against defendants Calumet City and Horka. The trial court ruled that plaintiffs' complaint failed to show intent to injure. Plaintiffs argue that the complaint alleges all requisite elements of the tort of intentional infliction of emotional distress.

■ To sufficiently plead a cause of action for intentional infliction of emotional distress, plaintiffs must allege facts which establish (1) the conduct was extreme and outrageous; (2) the conduct resulted in severe emotional distress; (3) the conduct was intentional or in reckless disregard of the consequences; and (4) the conduct was the actual and proximate cause of emotional distress. *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765; *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 533 N.E.2d 806.

The Illinois Supreme Court has determined that extreme and outrageous conduct is that which goes beyond all bounds of decency. (*Public Finance*, 66 Ill. 2d at 90.) Whether certain conduct can be characterized as extreme and outrageous necessarily depends on the facts of each case. *Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 855, 392 N.E.2d 591, 595.

Reckless disregard is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. (*Public Finance*, 66 Ill. 2d at 90.) It is not enough that the plaintiff experience fright or worry; to be actionable, the distress must be of such intensity and duration that no reasonable person could be expected to endure it. *Public Finance*, 66 Ill. 2d at 90.

The authority cited by plaintiffs in support of their contention that defendants' conduct can be judged to be extreme and outrageous is distinguishable on the facts (*Morrison v. Sandell* (1983), 112 Ill. App. 3d 1057, 446 N.E.2d 290 (stuffing toilet paper and human waste in a file drawer held extreme and outrageous)), and therefore unpersuasive.

Plaintiffs contend that the intentional character of defendants' conduct in not entering the apartment and in removing Jane Doe from the area was an abuse of position and authority. Jane Doe alleges that she and her children suffer severe emotional distress as a

result of defendants' conduct and that the conduct of defendants was either intentional, in reckless disregard of the consequences, or both. In support, plaintiffs cite *McGrath v. Fahey*. There, the court held that the plaintiff had adequately alleged intentional infliction of emotional distress where defendants, a bank and its president, threatened to exercise their power to coerce the plaintiff into signing over his second mortgage to the bank, something he would not do otherwise. The court held such coercion on the part of defendants in a position of authority met the intent requirement of an intentional infliction of emotional distress claim. *McGrath*, 126 Ill. 2d at 89-90.

■ In the present case, plaintiffs have not alleged that the police used their position of authority to coerce Jane Doe into doing something she would otherwise not do. The trial court found it likely that the police officers restrained Jane Doe from reentering the apartment to protect her from further danger. Further, defendant Horka's decision not to break down the apartment door was a judgment call that cannot be said to have shown intent to inflict emotional distress under the facts set forth in plaintiffs' complaint.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

O'CONNOR, J., concurs.

JUSTICE MANNING, dissenting:

I must dissent from the majority decision in this case. It is well established that a trial court should dismiss a cause of action on the pleadings only if it is clearly apparent that no set of facts can be proved which will entitle a plaintiff to recover. (*Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 565 N.E.2d 654.) When a challenge is raised as to all or part of a complaint pursuant to a section 2—615 motion to strike or dismiss, all well-pleaded facts in the attacked portion of the complaint are to be taken as true. (*Miner v. Gillette Co.* (1981), 87 Ill. 2d 7, 428 N.E.2d 478.) The role of the reviewing court is to determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, are sufficient to set forth a cause of action upon which relief may be granted. (*Zandrozny v. City Colleges* (1991), 220 Ill. App. 3d 290, 581 N.E.2d 44.) Thus our review here is limited to the allegations set forth in the complaint. Plaintiffs pleaded in their complaint that:

Defendant Horka arrived at the scene and assumed a supervisory role;

Defendant Giglio arrived on the scene a short time before Horka;

From the time Horka arrived and thereafter, he was the officer in charge, assumed supervisory responsibility, and gave instructions and orders to other officers and maintained control of the scene, the building and all persons in the area; specifically, he maintained control of Jane so that she was restrained and unable to aid her children;

Plaintiff Jane Doe told Horka that the intruder said, "I'm going to kill your children," and that she pleaded with Horka to break the door in;

Horka responded that he would not break down the door because he would be held responsible for the property damages; and that he further indicated there was nothing he could do and would not break down the door;

When plaintiff attempted to break down the door herself one or more of the defendants physically restrained and prevented her from going into the apartment;

At no time did Horka break down the door to the apartment nor did he or any other officer attempt or direct any other officer to enter the apartment in any other manner;

Defendants Horka, Beasley, Surufka and Giglio at all times material to the incident knew, were on notice, and were all uniquely aware of the facts and circumstances surrounding the intruder, his sexual assault of plaintiff, the danger and threat to Betty and John, and his presence in the apartment with Betty and John;

Defendant police officers were in the direct and immediate control of Betty and John Doe at 278 Yates Street, Calumet City, on the morning of December 20, 1987, from 4:30 a.m. until 5:30 a.m.; and

Each officer had a duty to enter plaintiffs' apartment, by force if necessary, to prevent injury to plaintiff Jane Doe's minor children; and that none of the defendant officers took any action to enter the premises in which Betty and John Doe were exposed to danger.

While it has been held in Illinois that a municipality or its employees may not be held liable for failure to supply general police or fire protection (*Huey v. Town of Cicero* (1968), 41 Ill. 2d 361, 363, 243 N.E.2d 214), an exception to that general immunity exists where the public employee exercises care or custody over an individual. (*Anthony v. City of Chicago* (1988), 168 Ill. App. 3d 733, 736, 523 N.E.2d 22.) In those instances, the individual's status is elevated beyond that of a member of the general public, the "special duty" exception is activated and the employee is liable for injury proximately

caused by his negligence. *Fessler v. R.E.J. Inc.* (1987), 161 Ill. App. 3d 290, 296, 514 N.E.2d 515.

In *Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 565 N.E.2d 654, plaintiff filed a three-count complaint against defendant seeking to recover damages for injuries he sustained while participating in an adult swimming class held at the Village of Glendale Heights sports complex. The trial court granted defendant's motion to dismiss counts II and III of the complaint. The appellate court reversed the trial court, and the Illinois Supreme Court reversed the appellate court.

Count II of the complaint alleged liability in tort because defendant had established a "special relationship of control and supervision over the plaintiff." Count III of the complaint alleged liability in tort because defendant operated the sports complex and swimming pool as a proprietary function. In arguing that the test for establishing a special relationship existed, plaintiff first asserted that defendant was uniquely aware of the particular danger or risk to which plaintiff was exposed. Plaintiff argued that his complaint clearly alleged that he was a "beginner swimmer" and that defendant supplied a "qualified" swimming instructor who knew or should have known that directing a beginner to jump into the shallow end of a concrete swimming pool could result in injuries.

As to specific acts or omissions by defendant which caused the injuries, plaintiff maintained that his complaint averred he was told to jump into the pool by the swimming instructor. Plaintiff likened the affirmative command given by the swimming instructor to that given by the fireman in *Anthony v. City of Chicago* (1988), 168 Ill. App. 3d 733, 523 N.E.2d 22, where the court found that by instructing a bystander to accompany him into a burning building the fireman's affirmative act created a position of peril to the bystander.

As to the third part of the test, which requires that the specific acts in question be affirmative or willful in nature, plaintiff again relied on the fact that the swimming instructor commanded him to jump into the pool.

Plaintiff maintained that the fourth part of the test, which requires that the injury to plaintiff occur while plaintiff is under the direct and immediate control of defendant, should be disregarded. Specifically, he asserted that the court should adopt the language of *Brooks v. Lundeen* (1977), 49 Ill. App. 3d 1, 364 N.E.2d 423, which would find a special relationship based on traditional concepts of duty and foreseeability in negligence law. The appellate court refused to accept plaintiff's argument and stated that the determination of

whether a special relationship existed must be analyzed in accordance with the four-part test in *Bell v. Village of Midlothian* (1980), 90 Ill. App. 3d 967, 414 N.E.2d 104.

In reversing the appellate court, the supreme court stated that plaintiff had probably pleaded enough facts to satisfy parts 2 and 3 of the special relationship test, but that the complaint failed to contain sufficient averments of facts under parts 1 and 4 of the test to state a cause of action. The court reasoned that the complaint was devoid of any factual allegations that defendant was aware of any particular danger or risk to which plaintiff was exposed (*Burdinie*, 139 Ill. 2d at 521), and that plaintiff also failed to allege any facts to support a claim that he was injured while under the direct and immediate control of defendant. (*Burdinie*, 139 Ill. 2d at 525.) However, the court stated that a person is under the direct and immediate control of a municipality if a municipal employee who is acting with official authority which private citizens would reasonably believe they cannot refuse (such as a police officer's authority) makes a request of the private citizen and the citizen complies with the request. (*Burdinie*, 139 Ill. 2d at 526.) The court found that because plaintiff was not forced to jump into the pool, nor ordered or instructed to jump by a person whom he could have reasonably believed he must obey, plaintiff failed to satisfy the fourth prong of the special relationship test.

Similarly, in *Huey v. Town of Cicero* (1968), 41 Ill. 2d 361, 243 N.E.2d 214, the Illinois Supreme Court affirmed the dismissal of a complaint against the defendant, finding that plaintiff's complaint did not set forth a basis for deviation from the general statutory immunity granted public entities by the Local Governmental and Governmental Employees Tort Immunity Act. In that case, plaintiff's decedent was fatally beaten by four white youths while en route to an employment office in Cicero, Illinois. Plaintiff's complaint averred that the town failed to warn him of the dangers a black person faced being on the streets of Cicero at a particular time. The appellate court held that since the complaint did not allege that defendants knew of plaintiff's decedent's presence in town, or had reason to know that he required protection from a specific danger, no relationship could be found sufficient to impose a duty upon the city to warn plaintiff's decedent of danger. (*Huey*, 41 Ill. 2d at 364.) The court further held that the complaint lacked allegations of specific acts or omissions by defendant or any causal connection between such conduct and the fatal injury to plaintiff's decedent. *Huey*, 41 Ill. 2d at 364.

The instant case is distinguishable from *Burdinie* and *Huey*. Here, I find the facts as alleged in plaintiffs' complaint expressly satisfy "unique awareness" and "control and supervision" over plaintiff sufficient to satisfy the *Bell* test. First, the complaint averred that plaintiff told Horka that the intruder was inside the apartment with her children and that the intruder had threatened to kill them. Plaintiff further advised Horka that the intruder had sexually assaulted her while she was inside the apartment. The complaint also stated that defendant knew, was on notice, and that all the agents of defendant were uniquely aware of the facts and circumstances and the danger and threat to Betty and John Doe. Thus, these pleadings suggest that defendant was uniquely aware of the particular risk that plaintiffs faced of being sexually assaulted, physically harmed or murdered.

Plaintiffs' complaint further averred that Horka refused to break down the apartment door, refused to allow plaintiff and others to break the door down and told plaintiff that there was nothing he could do. Horka also refused to direct other officers to break down the door. The intruder remained inside the apartment and eventually injured plaintiffs. I find these pleadings sufficient to meet the second prong of the test, which requires that plaintiff allege specific acts or omissions by defendant which caused the injuries.

As to the third prong of the test, which requires that the specific acts in question be affirmative or willful, clearly the pleadings established that Horka willfully refused to break down the apartment door and restrained plaintiff and others from entering the apartment. The pleadings state that Horka advised plaintiff that he would not break down the door because he would be held responsible for the property damage, and that there was nothing he could do.

I would find that the fourth prong of the test, which requires that the injury occur while plaintiff is under the direct and immediate control of defendant, is satisfied here. The pleadings state that defendant police officers were in the direct control of the residence at 278 Yates Street when the injury occurred. They further state that Horka was the supervising officer, gave orders and maintained control of the scene, the building and all persons in the area. More significantly, Horka physically restrained plaintiff, other officers and paramedics from entering the apartment or breaking down the door.

I believe that the language in *Burdinie* is controlling here. Plaintiff and her neighbors were ordered not to enter the apartment by Horka. Certainly, they could reasonably believe that Horka had the authority to restrain them from entering the apartment and that they

could not refuse that request. Horka arrived at the scene, assumed a supervisory role, and the other officers complied with his orders.

Although the *Burdinie* court held that no special relationship existed, the facts here are distinguishable from those in *Burdinie*. The defendant in *Burdinie* was a swimming instructor, not a police officer. The facts in *Burdinie* do not indicate that the instructor had knowledge of a known danger that existed in the swimming pool, while the pleadings in this case specifically state that defendant knew of the danger plaintiffs faced. Further, unlike the plaintiff in *Huey*, plaintiff in this case specifically alleged in the complaint that defendant knew of the danger plaintiffs faced.

I would recognize, as the majority apparently cannot, that the officers' knowledge of plaintiffs' predicament and their expression of intent to help, coupled with their affirmative acts, amounted to direct control over plaintiffs. Restraining plaintiff Jane Doe and others from acting on their own behalf is an affirmative act which I believe constituted direct physical control. Indeed, the majority decision here relieves the City of Calumet City and its police officers of any obligation to do more than show up at the scene of a crime. Once at the scene, they are free to stand by and observe without incurring liability for their action, likened to spectators at a wrestling match. This is true even if the officers have special knowledge that harm will be done to a victim who cries out for help.

I find there are sufficient allegations in the complaint to establish that the municipality "instructed," "directed" or otherwise exercised direct and immediate control over plaintiffs. I would allow plaintiffs to show that respondent's failure to help during this crisis arose, not out of the sound exercise of professional judgment, but from arbitrariness and capriciousness that cannot be condoned by this State. My disagreement with the majority arises from its failure to recognize, as the statute requires, that a motion to dismiss be viewed in the light most favorable to plaintiff. When plaintiffs' complaint is viewed in that light, it is clear that plaintiffs have pleaded facts and circumstances establishing that the City of Calumet City's actions in this case created a special relationship.

Therefore, I respectfully dissent.