(No. 75347.—

JANE DOE *et al.*, Appellants, v. CALUMET CITY *et al.*, Appellees.

*Opinion filed August 4, 1994.—Rehearing denied October 3, 1994.*

HEIPLE, J., joined by BILANDIC, C.J., concurring in part and dissenting in part.

Eunice Ward, of Nottage & Ward, Edward T. Stein, Cecile Singer and Clifford Zimmerman, all of Chicago, for appellants.

Gregory E. Rogus and Paul E. Wojcicki, of Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago, for appellee City of Calumet City.

Robert B. Baal and Paul G. O'Toole, of Baal & O'Connor, of Chicago, for appellees James Horka, Daniel Surufka and Kevin Beasley.

Thomas G. DiCianni, of Ancel, Glink, Diamond, Cope & Bush, P.C., of Chicago (David Lincoln Ader, of counsel), for appellees Village of Burnham and Gregory Giglio.

Michael Deutsch, Joan P. Gibbs and Suzanne L. Shende, of New York, New York, and Nadine Taub, of Newark, New Jersey, for *amicus curiae* The Center for Constitutional Rights.

JUSTICE NICKELS delivered the opinion of the court:

This appeal reviews whether plaintiffs have stated a

cause of action against defendant police officers and their respective municipalities for conduct while responding to a police call. Plaintiffs are Jane Doe (Jane) and her two minor children, Betty and John. Defendants on appeal are Calumet City and its officers James Horka, Daniel Surufka and Kevin Beasley; and the Village of Burnham and its officer Gregory Giglio. An additional defendant, Ben Valentine, is not a subject of this appeal.

Plaintiffs filed a complaint in the circuit court of Cook County charging defendants *inter alia* with: (1) negligence; (2) intentional infliction of emotional distress; and (3) liability for gender discrimination under 42 U.S.C. § 1983 (1982). The circuit court granted defendants' motion to dismiss all three counts for failure to state a claim upon which relief could be granted. (Ill. Rev. Stat. 1987, ch. 110, par. 2—615.) The appellate court, with one justice dissenting, affirmed. (240 Ill. App. 3d 911.) We granted plaintiffs leave to appeal and took jurisdiction pursuant to Supreme Court Rule 315(a) (107 Ill. 2d R. 315(a)).

In reviewing the negligence count, we must determine whether the plaintiffs have alleged sufficient facts to show that a special relationship existed between Betty, John and the defendants such that the Local Governmental and Governmental Employees Tort Immunity Act (hereinafter Tort Immunity Act) does not preclude liability. (Ill. Rev. Stat. 1987, ch. 85, par. 1—101 *et seq.*) In addition, we must determine whether an exception to the Tort Immunity Act exists for willful and wanton negligence of a police officer. On review of the intentional infliction of emotional distress count, we decide whether plaintiffs' complaint alleges sufficient facts to support each element of a cause of action. We review plaintiffs' gender discrimination count to determine whether plaintiffs' complaint satisfies the statutory

prerequisites for a cause of action under 42 U.S.C. § 1983 (1982). We also examine the application of our pleading rules to section 1983 claims in light of the Supreme Court's decision striking down heightened pleading standards for civil rights litigation in the Federal courts.

A motion to dismiss tests the legal sufficiency of a pleading and a court must accept all well-pleaded facts as true. (*Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 298.) The following recitation of facts is therefore taken from the plaintiffs' complaint. At 4:30 a.m. a male intruder, Valentine, illegally entered the apartment of plaintiffs while they slept. Valentine entered Jane's bedroom and climbed on top of her, grabbing her clothing and touching her breasts and genital area. At this time, Valentine declared his intention to rape Jane and also threatened to kill her.

Jane's two minor children, Betty and John, were in the room during Valentine's attack of Jane. Afraid for the safety of her children, Jane pleaded with Valentine not to continue the attack with her children present. Valentine got off the bed and directed the children to leave. Valentine followed the children out of the bedroom, threatening to kill them.

Jane then made a break for the front door and Valentine caught her on the stairs leading from the apartment. Valentine and Jane fell down the stairs and Valentine then beat Jane and again threatened to kill her. Jane grabbed hold of the railing and would not let go. Valentine then left Jane and reentered the apartment where Betty and John remained, locking the door behind him. Jane unsuccessfully attempted to gain entry to the apartment by kicking and pushing the door.

Jane, clothed only in undergarments, then left the building screaming. Several neighbors, having heard the screams, dialed 911. Officer Giglio was the first to arrive at the scene. Officer Horka arrived a short time later and assumed a supervisory role.

Officer Horka asked Jane what had happened. Jane told him that there was a man in her apartment, and that the man had tried to rape her and had threatened to kill her and her children. Jane also told Officer Horka that her children were still in the apartment and she feared for their safety. Jane pleaded with Horka to break down the door and rescue her children. Several neighbors also pleaded with the officers to break down the door.

Officer Horka declined to break down the door, stating that he did not want to be responsible for the property damage. Jane repeatedly stated that she would pay for any damage and screamed that she herself would save her children. When Jane attempted to rescue her children, several defendant police officers ordered her to stay put and then physically restrained her. The plaintiffs' complaint also alleges that the defendant police officers prevented neighbors from breaking down the door. Instead of breaking down the door, an unknown defendant police officer called the landlord who resided in South Holland, Illinois, and requested a key.

Plaintiffs' complaint alleges that Officer Horka questioned Jane in a rude, demeaning and accusatory manner and asked inappropriate questions. Horka asked Jane: "Where is your husband?" "Do you know the guy?" "Why would you leave your children in the apartment if there was a strange man there?" "Why did you leave the apartment without a key?" Officer Horka also described Jane as "an hysterical woman" and stated that "this girl is freaking out." The complaint also alleges that Officer Horka stated that Jane was not coherent, while the neighbors could fully comprehend Jane's statements.

After questioning Jane, Officer Horka checked the front door and rang several apartment buzzers. Officer Horka. and Officer Giglio then walked around the

building allegedly checking Jane's windows and rear door. Plaintiffs' complaint claims the rear balcony sliding glass doors, 12 feet above ground level, were unlocked and ajar. In addition, plaintiffs' complaint alleges that the rear door of the building and the back door to Jane's apartment were unlocked.

Officer Horka ordered Officer Giglio to stay at the back door. Officer Horka then walked to the front of the building where he met Officer Surufka, who had just arrived at the scene. Officer Horka spoke by radio to his supervisor, Sergeant Targonski, who directed Horka to break down the door. Officer Beasley then arrived at the scene. Several paramedics arrived and told the officers that a "lock pick," a locksmith, and ladder were available for gaining entry into the apartment. Officers Horka, Giglio, Surufka and Beasley did not attempt to gain entry into Jane's apartment. Officers Beasley and Surufka tapped on windows and rang the doorbell to the apartment.

At approximately 5 a.m., Investigator Miller of the Calumet City police department arrived at the scene and interviewed Jane. Accompanied by several officers, Investigator Miller entered the apartment through the rear door of the building and the back door of the apartment, which were unlocked. When the officers arrived, they found Valentine raping Betty. From the time the officers arrived until Investigator Miller interceded, Valentine had repeatedly raped Betty and forced her to perform deviate sexual acts. Also during this time, Valentine choked and threatened John.

From these facts, plaintiffs' complaint framed three theories for transferring the cost of their injuries to the defendant police officers and their respective municipalities. Betty and John brought a negligence count alleging the special duty exception to defendants' statutory immunity. In addition, the negligence count

also alleged willful and wanton misconduct. Jane brought a count alleging intentional infliction of emotional distress. Jane, Betty and John all joined in a count seeking recovery for gender discrimination pursuant to 42 U.S.C. § 1983 (1982).

Section I examines whether Betty and John have alleged sufficient facts to state a cause of action for negligence. Section II examines whether Jane has stated a cause of action for intentional infliction of emotional distress. Section III questions whether plaintiffs' complaint satisfies the statutory prerequisites for personal and municipal liability under 42 U.S.C. § 1983 (1982).

## I. Negligence

Plaintiffs' complaint has a count entitled "Duty to Protect/Special relationship." This count frames a theory of simple negligence based on the special duty exception to the common law and statutory immunities granted police officers and their municipalities. In addition to alleging simple negligence, the count also contains an allegation that the officers' conduct was willful and wanton. As the simple negligence count and the willful and wanton allegation raise distinct issues, we address them separately.

## A. Simple Negligence

In order to state a cause of action for negligence, a plaintiff's complaint must establish that defendant owed plaintiff a duty, that defendant breached that duty, and that plaintiff's injury was proximately caused by the breach. (*Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 162.) A motion to dismiss tests the legal sufficiency of a pleading. (*Aguilar v. Safeway Insurance Co.* (1991), 221 Ill. App. 3d 1095, 1100.) In determining the legal sufficiency of a complaint, all well-pleaded facts are taken as true and all reasonable inferences from those facts are drawn in favor of plaintiff. (*Sharps v. Stein* (1980), 90 Ill.

App. 3d 435, 438.) However, mere conclusions of law or fact unsupported by specific factual allegations in a complaint are disregarded on a motion to dismiss. (*Groenings v. City of St. Charles* (1991), 215 Ill. App. 3d 295, 299.) On appeal, a reviewing court must determine whether allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *McCauley v. Chicago Board of Education* (1978), 66 Ill. App. 3d 676, 677.

At common law, municipalities in Illinois owed no duty to the public to supply police or fire protection. (*Santy v. Bresee* (1984), 129 Ill. App. 3d 658, 661.) This "public duty" rule prevented a plaintiff's recovery for negligence. (*Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443, 445.) This common law protection afforded municipalities became embodied in statutory immunities granted under the Tort Immunity Act. (The Illinois Constitution of 1970 abolished the doctrine of sovereign immunity "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4.) The Tort Immunity Act provides:

"§ 4—102. Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." Ill. Rev. Stat. 1987, ch. 85, par. 4—102.

"§ 4—107. Neither a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest or by releasing a person in custody." Ill. Rev. Stat. 1987, ch. 85, par. 4—107.

An exception to both the common law public duty rule and the statutory immunities has evolved where the actions of the municipality's agent showed a special relationship with the plaintiff that created a duty

different from the duty owed to the general public. (*Gardner v. Village of Chicago Ridge* (1966), 71 Ill. App. 2d 373, 380 (finding "special duty" exists to exercise reasonable care where police call plaintiff into position of peril).) This court has created a four-part test to determine whether plaintiffs can avail themselves of the special duty exception: (1) the municipality must be uniquely aware of the particular danger or risk to which plaintiff is exposed; (2) there must be specific acts or omissions on the part of the municipality; (3) the specific acts must be affirmative or willful in nature; and (4) the injury must occur while the plaintiff is under the direct and immediate control of municipal employees or agents. *Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 508.

The trial court dismissed the action because Betty and John were not under the direct and immediate control of the officers. Plaintiffs argue that their complaint satisfies the direct and immediate control element based on allegations that the officers were in control of the scene and the building where the attack on Betty and John occurred. In particular, plaintiffs argue that Officer Horka's control over the other officers, Jane, and other potential rescuers satisfies the control prong.

This court has interpreted the control element to require that "the public employee initiates the circumstances which create the dangerous situation." (*Burdinie*, 139 Ill. 2d at 525-26.) Applying this standard, this court has found the control element satisfied where an officer ordered a driver to halt in an active traffic lane and then directed her to inspect her license plate where she was injured. *Leone v. City of Chicago* (1993), 156 Ill. 2d 33, 40; see also *Gordon v. County of Jackson* (1992), 231 Ill. App. 3d 1017 (officer initiating dangerous situation by bringing intoxicated, unrestrained man known

to be violent to a hospital); *Anthony v. City of Chicago* (1988), 168 Ill. App. 3d 733 (firefighter initiating dangerous situation by ordering civilian to assist by opening elevator door); *Brooks v. Lundeen* (1977), 49 Ill. App. 3d 1 (officers initiating dangerous situation by ordering motorist to park next to road block when speeding motorist was approaching); *Gardner v. Village of Chicago Ridge* (1966), 71 Ill. App. 2d 373 (officer initiated dangerous situation by bringing witness to identify four defendants who proceeded to beat witness).

We find that plaintiffs' complaint does not allege sufficient facts to show that Betty and John were under the direct and immediate control of defendants. Defendant police officers did not initiate the circumstances that created the danger to Betty and John. The officers did not bring the intruder to the plaintiffs' home or order the children to remain there. Plaintiffs were not "called into a position of peril" by the police. Therefore, the police did not owe plaintiffs a special duty different from the duty owed the general public.

Plaintiffs' argument that control of the scene satisfies the control element is unavailing. Police and fire departments, as paramilitary organizations, are by their nature expected to exercise control over a scene requiring their services. The public duty rule and the statutory immunities granted police officers rest on the sound public policy that municipalities undertake these services without becoming insurers. Applying the plaintiffs' definition of the control element would cause the exception to swallow the rule and would make municipalities liable for simple negligence whenever officers respond to an emergency. The public duty rule protects against just this sort of paralyzing liability.

We find that the special duty rule as discussed strikes the proper balance between the interests of the municipality and the public. Where the municipality's

agent does not initiate the circumstances that creates the dangerous situation, the control element is not satisfied and no special duty can come into existence. Therefore, plaintiffs' count alleging simple negligence on behalf of Betty and John against the defendant police officers and their municipalities was properly dismissed by the trial court.

## B. Willful and Wanton Conduct

In addition to simple negligence, plaintiffs' negligence count alleges that defendants were liable for willful and wanton conduct. We acknowledge that carving a willful and wanton count from plaintiffs' negligence count presents a technical violation of our practice rules requiring that each cause of action be stated in a separate count. (Ill. Rev. Stat. 1987, ch. 110, par. 2—603(b).) However, a motion to dismiss should be denied where a cause of action is stated, even if it is not the cause of action intended by the plaintiff. (*Luethi v. Yellow Cab Co.* (1985), 136 Ill. App. 3d 829, 833.) Given the confusion concerning whether willful and wanton conduct constitutes a separate cause of action that could be stated against a police officer, we consider plaintiffs' claim.

The Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law *unless such act or omission constitutes willful and wanton conduct.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 85, par. 2—202.) We must decide whether this exception applies to police officers owing no special duty to plaintiff. In addition, if the exception applies, we must determine whether plaintiffs' complaint alleges sufficient facts to create a jury question regarding the willful and wanton nature of defendants' conduct.

Courts have applied various approaches in construing the willful and wanton language of section 2—202

with the common law special duty exception and the specific immunities granted police officers in sections 4—102 and 4—107. The trial court added a showing of willful and wanton conduct to the requirements needed to show a special duty. The trial court then dismissed the negligence count based on the lack of the control element needed to show a special duty. Several panels of the appellate court have taken a different approach and found that sections 4—102 and 4—107 provide specific blanket immunity to police officers that prevails over section 2—202. (See, *e.g.*, *Luber v. City of Highland* (1986), 151 Ill. App. 3d 758, 763; *Jamison v. City of Chicago* (1977), 48 Ill. App. 3d 567, 569.) Under this reasoning, police officers receive immunity even from allegations of willful and wanton conduct. In contrast, some courts have considered willful and wanton conduct to be a statutory exception to the Tort Immunity Act completely separate from the judicially created special duty exception. (See, *e.g.*, *Sank v. Poole* (1992), 231 Ill. App. 3d 780; *Trepachko v. Village of Westhaven* (1989), 184 Ill. App. 3d 241, 249.) Under this reasoning, a plaintiff can state a cause of action for simple negligence by showing a special duty exists, or can allege willful and wanton conduct alone.

We find this issue to be settled by this court's recent decision in *Leone v. City of Chicago* (1993), 156 Ill. 2d 33. The city in *Leone* argued that the special duty exception required a showing of willful and wanton conduct pursuant to section 2—202 of the Tort Immunity Act. This court held that the judicially created special duty exception and the statutory willful and wanton exception were separate and distinct exceptions to municipal and officer immunity. In support, the court noted that "[i]ncorporating a willful and wanton requirement into the special duty doctrine would therefore yield the anomalous result of making recovery more difficult

under the doctrine than it already is under the statute. Under these circumstances, the doctrine would cease to operate as an 'exception' to sovereign immunity and would instead become an expansion of it." (*Leone*, 156 Ill. 2d at 39.) Therefore, plaintiffs can escape the statutory immunities granted municipalities and their employees either by proving facts that show the existence of a special duty and proving simple negligence or by proving willful and wanton conduct alone.

We must therefore determine whether the allegations in the plaintiffs' complaint, when viewed in a light most favorable to the plaintiffs, present a *prima facie* showing that any of the defendant police officers' conduct was willful and wanton. Willful and wanton conduct is defined under the Tort Immunity Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." (Ill. Rev. Stat. 1987, ch. 85, par. 1—210.) Whether conduct is "willful and wanton" is ultimately a question of fact for the jury. (*Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 1075.) However, a court must first decide as a matter of law whether a plaintiff has alleged sufficient facts such that a jury question concerning the willful and wanton nature of defendant's conduct is created.

We find that plaintiffs' complaint presents a jury question as to whether Officer Horka's conduct was willful and wanton. The complaint repeatedly states that Officer Horka was the officer in control at the scene. Plaintiffs' complaint alleges that Officer Horka was aware of the facts surrounding the intrusion into plaintiffs' home, including the assault of Jane and the presence of the intruder in the plaintiffs' home with Betty and John. Plaintiffs' complaint also alleges that Officer Horka should have acted under these circum-

stances to protect Betty and John, but did not because of fear of liability for property damage. A rational trier of fact could find that Officer Horka's conduct showed an "utter indifference or conscious disregard for the safety of" Betty and John. Therefore, the trial court was in error when it granted the motion to dismiss plaintiffs' count brought on behalf of Betty and John alleging willful and wanton conduct against Officer Horka and Calumet City.

The allegations in the complaint are insufficient to create a jury question regarding the willful and wanton nature of the conduct of defendants Surufka, Beasley and Giglio. The only allegations in the complaint regarding those officers are that they arrived at the scene, followed Officer Horka's orders to take positions around the apartment, and failed to rescue Betty and John. A police department is a paramilitary operation. (See *Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808.) Individual police officers are subject to a chain of command. "A rule permitting each officer to subjectively determine whether he believes an order to be lawful and reasonable would destroy the discipline necessarily inherent in a paramilitary organization such as the police department." (*Martin*, 149 Ill. App. 3d at 808.) A reasonable jury could not find that Surufka, Beasley and Giglio were willful and wanton in their conduct for nothing more than following the orders of their superior officer. Therefore, the count alleging willful and wanton conduct on the part of Surufka, Beasley and Giglio was properly dismissed.

II. Intentional Infliction of Emotional Distress

We next consider whether plaintiffs' complaint states a cause of action for intentional infliction of emotional distress. That count was brought on behalf of Jane against all the defendant police officers and their municipalities. The trial court granted defendants'

section 2—615 motion (Ill. Rev. Stat. 1987, ch. 110, par. 2—615), and the appellate court affirmed (240 Ill. App. 3d 911). On review of a section 2—615 motion to dismiss, we examine the face of the complaint to determine whether there is any set of facts which may be proved that would entitle the plaintiff to relief. *Toys "R" Us, Inc. v. Adelman* (1991), 215 Ill. App. 3d 561, 564.

In order to state a cause of action for intentional infliction of emotional distress, a party must allege facts which establish that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; (3) the defendant's conduct in fact caused severe emotional distress. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85.) Applying the principles of review stated above, we review each element in turn.

First, defendants' conduct must be extreme and outrageous. Conduct is of an extreme and outrageous character where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " (Restatement (Second) of Torts § 46, Comment *d*, at 73 (1965).) Such conduct must be differentiated from the "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that are part of the costs of complex society from which the law provides no protection. (Restatement (Second) of Torts § 46, Comment *d*, at 73 (1965).) Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case. *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 90.

The extreme and outrageous character of the conduct can arise from the abuse of a position of power. (*Kolegas v. Heftel Broadcasting Corp.* (1992), 154 Ill. 2d

1, 21.) The Restatement lists police officers, school authorities, landlords and collecting creditors as examples of types of individuals who in exercising their authority can become liable for extreme abuses of their positions. (Restatement (Second) of Torts § 46, Comment *e*, at 74 (1965).) When abuse of a position of authority is at issue, courts also examine whether the defendant reasonably believed that his objective was legitimate. (*McGrath v. Fahey* (1988), 126 Ill. 2d 78, 88.) While all conduct is not immunized, more latitude is given to a defendant pursuing his legitimate objectives. See, *e.g.*, *Public Finance*, 66 Ill. 2d at 92 ("A creditor must be given some latitude to pursue reasonable methods of collecting debts even though such methods may result in some inconvenience, embarrassment or annoyance to the debtor"); *Gibson v. Chemical Card Services Corp.* (1987), 157 Ill. App. 3d 211 (noting that employer had legitimate objective in conducting theft investigation in finding conduct was not outrageous).

Another factor relevant in determining whether conduct is extreme or outrageous is defendant's awareness that the plaintiff is particularly susceptible to emotional distress because of a physical or mental condition or peculiarity. (*Public Finance Corp.*, 66 Ill. 2d at 94; Restatement (Second) of Torts § 46, Comment *f*, at 75 (1965).) Conduct which might otherwise be considered merely rude or abusive may be deemed outrageous where the defendant knows that the plaintiff is particularly susceptible to emotional distress. *McGrath*, 126 Ill. 2d at 88; *Kolegas*, 154 Ill. 2d at 21.

Applying these considerations, we now determine whether plaintiffs' complaint adequately alleges extreme and outrageous conduct on the part of any of the defendant police officers. Plaintiffs' complaint alleges that Jane was assaulted in her apartment and the police were summoned to assist her. Horka, the supervising

officer, was advised by Jane that there was an intruder in her home who had attacked her and threatened to kill her children. Plaintiffs' complaint alleges that Officer Horka questioned Jane in rude, demeaning, and accusatory manner, dismissing her as "hysterical." In addition, Officer Horka asked inappropriate questions, such as, "Why did you leave your children in the apartment if there was a strange man there?" The complaint alleges that Officer Horka declined to break down the door because he did not want to be responsible for any property damage.

We believe these facts are sufficiently outrageous to satisfy the first element of a cause of action against Officer Horka. An average member of the community would no doubt resent a police officer who treated a sexual assault victim in a rude and demeaning manner, and would consider it outrageous for an officer to refuse to break down a door in such a situation because of the fear of liability for property damage. It is also reasonable to infer that Officer Horka knew that Jane was in an emotional state that would make her susceptible to severe emotional distress. Jane told Horka that she had only recently escaped a sexual assault and expressed her fear for the safety of her children.

Our conclusion is bolstered by the fact that Officer Horka was in a position of power as the officer in control of the scene. The appellate court incorrectly limited the application of the abuse of power factor in determining outrageous conduct to circumstances where the position was used as a means of coercion. While coercion might be the most common abuse of a position of power, an abuse of a position of power can be a factor in finding outrageous conduct regardless of coercion. For example, this court found using the medium of radio to insult a plaintiff to be an abuse of power supporting a finding of outrageous conduct. (*Kolegas*, 154 Ill. 2d at 22.) In

viewing the allegations of the complaint in a light most favorable to the plaintiffs, Officer Horka abused a position of power when he questioned a recent sexual assault victim in a rude, demeaning manner and refused to save her children for fear of personal liability for property damage.

We also note that the outrageous character of Officer Horka's conduct is not ameliorated by any reasonable belief he was pursuing a legitimate objective. Freedom from personal liability for property damage is not a legitimate objective of a police officer summoned to protect people from a dangerous intruder. Moreover, Officer Horka's treatment of Jane was not necessary to determine appropriate police response. Plaintiffs' complaint adequately alleged sufficient facts to support a finding that Officer Horka's conduct was outrageous.

Plaintiffs' complaint does not allege sufficient facts to support any outrageous conduct on the part of the other officers that responded to the call. The only allegations regarding Officers Surufka, Beasley, and Giglio are that they arrived at the scene, followed Horka's orders, and did not act to rescue Betty and John. There are no allegations that the other officers questioned Jane in a rude manner or declined to save Betty and John out of fear of personal liability. As the plaintiffs' complaint fails to allege sufficient facts to satisfy the element of outrageous conduct on the part of Officers Surufka, Beasley and Giglio, the count for intentional infliction of emotional distress against them was properly dismissed.

Proceeding with the intentional infliction of emotional distress count against Officer Horka, we must determine whether the plaintiffs' complaint supports the remaining elements for a cause of action. In order to satisfy the intent element, there must be facts pleaded that show Horka either intended that his conduct inflict

severe emotional distress or knew that there was a high probability that his conduct would cause severe emotional distress. (*Public Finance Corp.*, 66 Ill. 2d at 90.) In view of the recent assault on Jane and the threat to Betty and John, a reasonable jury could find that Officer Horka disregarded the high probability that his conduct would cause severe emotional distress when he dismissed Jane's pleas to help her children.

Plaintiffs' complaint must also allege that Jane actually suffered severe emotional distress. This element is necessary to prevent fictitious claims. The complaint alleges that Jane required psychological care after the incident. We also bear in mind that "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." (Restatement (Second) of Torts § 46, Comment *J*, at 78 (1965).) We find that the outrageous nature of Horka's conduct, combined with allegations in the complaint, when taken in a light most favorable to the plaintiff, make a satisfactory showing that Jane suffered severe emotional distress.

Last, plaintiffs' complaint must state facts that show Officer Horka's conduct was a cause of Jane's emotional distress. We recognize that Jane was already suffering emotional distress caused by Valentine's attack on her and her fear for the safety of her children. However, an injury may have more than one legal cause and a culpable defendant cannot escape liability by claiming that the conduct of other persons constituted a contributing cause. (*Phelan v. Santelli* (1975), 30 Ill. App. 3d 657.) A cause "is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." (Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 1989).) We find that a reasonable jury could find that Officer Horka's conduct was a legal cause of Jane's emotional distress. The fact

that Officer Horka's conduct only aggravated the emotional distress Jane was already suffering goes properly to the measure of damages. See generally W. Prosser, Torts § 52, at 320 (4th ed. 1971).

Therefore, plaintiffs' complaint states a cause of action on behalf of Jane for intentional infliction of emotional distress against defendant Horka and Calumet City. The trial court erred in dismissing that claim. The intentional infliction of emotional distress claims against Surufka, Beasley, Giglio and the Village of Burnham were properly dismissed.

### III. Gender Discrimination

Plaintiffs Jane, Betty and John all join in a count alleging gender discrimination against Officer Horka and Calumet City. This count was brought pursuant to 42 U.S.C. § 1983 (1982). While not itself conferring any substantive rights (see *Baker v. McCollan* (1979), 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 442 n.3, 99 S. Ct. 2689, 2694 n.3), section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." (42 U.S.C. § 1983 (1982).) As there are substantial differences between the prerequisites for personal liability and municipal liability under section 1983, we treat those defendants separately.

A. Plaintiffs' Section 1983 Claim Against Officer Horka

In order to state a section 1983 claim against Officer Horka, plaintiffs must allege sufficient facts to support two elements. First, the plaintiffs must allege that Officer Horka has deprived them of a Federal right. Second, plaintiffs must allege that Officer Horka acted under color of State law. (*Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 514, quoting *Gomez v. Toledo*

(1980), 446 U.S. 635, 640, 64 L. Ed. 2d 572, 577, 100 S. Ct. 1920, 1923.) As a police officer responding to a call while on duty, there is no doubt that Officer Horka was acting under color of State law, and he raises no issue in regard to this element. Therefore, the sole issue presented is whether the facts in plaintiffs' complaint, when viewed in a light most favorable to the plaintiffs, show a deprivation of a Federal right.

Plaintiffs' complaint alleges gender discrimination in violation of the equal protection clause of the fourteenth amendment. (U.S. Const., amend. XIV.) The fourteenth amendment equal protection clause protects individuals from invidious classifications made by State and local governments. (*Personnel Administrator v. Feeney* (1979), 442 U.S. 256, 60 L. Ed. 2d 870, 99 S. Ct. 2282.) The equal protection guarantee applies not only to legislative classifications, but also to discriminatory administration and enforcement of the law. (*Smith v. Ross* (6th Cir. 1973), 482 F.2d 33, 36-37; *Huey v. Barloga* (N.D. Ill. 1967), 277 F. Supp. 864.) Where gender discrimination is at issue, the differential treatment of men and women must bear a close and substantial relationship to a legitimate governmental objective. *Craig v. Boren* (1976), 429 U.S. 190, 197, 50 L. Ed. 2d 397, 407, 97 S. Ct. 451, 457.

In support of the gender discrimination claim, plaintiffs' complaint alleges that Officer Horka violated the plaintiffs' right to equal protection by treating Jane's complaint differently than if it were made by a male and by acting on gender-based stereotypes of females. Plaintiffs purport to state a cause of action for gender discrimination on behalf of Jane, Betty and John. However, the allegations in the complaint are directed only to gender discrimination suffered by Jane. Plaintiffs have provided no support for their contention that section 1983 can provide redress for an injury that

resulted from the deprivation of a constitutional right of another person. Therefore, we treat Jane as the sole plaintiff in our analysis of the section 1983 claim.

We find that the allegations in the complaint, when viewed in a light most favorable to the plaintiffs, make out a cognizable claim of gender discrimination. Initially, the manner in which Officer Horka treated Jane raises an inference of gender discrimination. Jane was clothed only in undergarments and had just suffered a sexual assault and a battle to escape her attacker. She also feared for her children, who remained at the mercy of her attacker. After being informed of this situation, Officer Horka allegedly questioned Jane in a rude and demeaning tone as to why she would leave her apartment with a strange man there and leave without a key. Horka allegedly also stated that he could not understand Jane and that she was not "coherent," while neighbors present could understand Jane at all times. In addition, Officer Horka described Jane, a woman old enough to have two children, as a "girl." A reasonable trier of fact could determine that such conduct shows Officer Horka discredited Jane's statements and dismissed her complaints based on her gender.

Against the backdrop of Officer Horka's treatment of Jane, Officer Horka's alleged comments give additional support for finding a cause of action for gender discrimination. Several cases have found potential equal protection violations where police fail to adequately respond to domestic violence complaints lodged by women. (See, *e.g.*, *Thurman v. City of Torrington* (D. Conn. 1984), 595 F. Supp. 1521; *Balistreri v. Pacifica Police Department* (9th Cir. 1990), 901 F.2d 696.) Despite being told of the attack on Jane and the threats against her children, Horka asked, "Where is your husband?" and "Do you know the guy?" before determining that he would not break down the door. Whether the attacker

was Jane's husband or someone she knew would not change the nature of the attack on Jane or the danger to Betty and John.

We acknowledge that these comments are capable of an innocent construction. However, against the backdrop of Officer Horka's alleged treatment of Jane, a reasonable trier of fact could find that Officer Horka dismissed Jane's plea for swift action because he continually believed this was a domestic situation less deserving of his attention. Such conduct is not at all related to any governmental purpose. Therefore, the complaint adequately states a cause of action for gender discrimination on behalf of Jane against Officer Horka.

We also note that the appellate court was in error when it incorrectly required a showing of a culpable municipal policy to impose personal liability on Officer Horka under section 1983. This error resulted from a failure to determine the capacity in which Officer Horka was sued. A suit against a government official in his personal capacity seeks to impose personal liability for actions taken under color of State law. (See *Kentucky v. Graham* (1985), 473 U.S. 159, 165-66, 87 L. Ed. 2d 114, 121-22, 105 S. Ct. 3099, 3105 (distinguishing personal and official capacity suits).) Where a judgment is obtained against a government official in his personal capacity, the judgment must be executed only against the official's personal assets. In contrast, a suit against a government official in his official capacity is essentially another manner of pleading an action against the entity of which the official is an agent. (*Graham*, 473 U.S. at 165, 87 L. Ed. 2d at 121, 105 S. Ct. at 3105.) A judgment against a government official sued in his official capacity is satisfied by the government entity itself. *Graham*, 473 U.S. at 166, 87 L. Ed. 2d at 121, 105 S. Ct. at 3105.

There are different requirements for establishing personal and municipal liability in a suit brought under

section 1983. In order to establish personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." (*Graham*, 473 U.S. at 166, 87 L. Ed. 2d at 122, 105 S. Ct. at 3105.) Personal liability can be imposed regardless of whether the conduct of the offending party was pursuant to a municipal policy or custom.

In order to impose municipal liability, regardless of whether the municipal liability is pleaded as official capacity liability, a plaintiff must make the further showing that the underlying deprivation resulted from a municipal policy or custom. The doctrine of *respondeat superior* does not apply in section 1983 litigation, and municipal liability cannot be premised merely on the employment relationship between the actor and the municipality. (*Monell v. Department of Social Services* (1978), 436 U.S. 658, 691, 56 L. Ed. 2d 611, 636, 98 S. Ct. 2018, 2036.) Instead, municipal liability under section 1983 requires that the municipality be at fault by having some municipal policy, custom or usage that is the "moving force" behind the deprivation of a Federal right. *Monell*, 436 U.S. at 694, 56 L. Ed. 2d at 638, 98 S. Ct. at 2037-38.

Plaintiffs' complaint was inartfully drawn in that it does not specifically state that the action against Horka was brought against him in his personal capacity. The Supreme Court has acknowledged that some complaints may not clearly specify whether the suit is brought against a defendant in his official or personal capacity. (*Graham*, 473 U.S. at 167 n.14, 87 L. Ed. 2d at 122 n.14, 105 S. Ct. at 3106 n.14.) In such cases, the " 'course of proceedings' " will typically indicate the nature of the liability sought to be imposed. (*Graham*, 473 U.S. at 167 n.14, 87 L. Ed. 2d at 122 n.14, 105 S. Ct. at 3106 n.14, quoting *Brandon v. Holt* (1985), 469 U.S. 464, 469, 83 L. Ed. 2d 878, 884, 105 S. Ct. 873, 876.) In the present case,

Calumet City was also listed as a defendant and considering the action against Horka in his official capacity would therefore be redundant. Thus, plaintiffs' action was brought against Officer Horka in his personal capacity and no policy or repeated instances of similar conduct need be shown to impose this liability.

B. Plaintiffs' 1983 Claim Against Calumet City

Our last task is to determine whether plaintiffs have stated a cause of action under section 1983 against Calumet City. The Supreme Court set forth the elements for municipal liability under section 1983 in *Monell v. Department of Social Services* (1978), 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018. Under *Monell*, section 1983 plaintiffs must establish (1) that they have suffered the deprivation of a constitutionally protected interest, and (2) that the deprivation was caused by an official policy, custom, or usage of the municipality. (*Monell*, 436 U.S. at 694, 56 L. Ed. 2d at 638, 98 S. Ct. at 2037-38.) As we have already determined that plaintiffs' complaint alleges sufficient facts to support a charge of gender discrimination, our sole remaining inquiry is whether that deprivation was caused by an official policy, custom or usage of Calumet City.

Plaintiffs have alleged the following facts to support the existence of a culpable municipal policy or custom of gender discrimination. First, plaintiffs allege that the conduct of Officer Horka during the incident is evidence of a municipal custom of gender discrimination. Second, plaintiffs point to Calumet City's past policy of strip-searching females, but not males, for nonfelony offenses. This policy was found unconstitutional by the District Court for the Northern District of Illinois. (*Doe v. Calumet City* (N.D. Ill. 1990), No. 87—3594 (mem. op. & order).) Plaintiffs allege that this policy institutionalized the disparate treatment of women. Third, plaintiffs argue that the municipality ratified the disparate

treatment of women by failing to institute policies to counteract the discriminatory effects of the strip searches. Fourth, plaintiffs argue that Calumet City ratified Officer Horka's conduct by not bringing Officer Horka up on charges specifically related to gender discrimination. Last, plaintiffs point out sexist comments, such as "Isn't this just like a woman," allegedly made by unidentified officers at the scene.

As a matter of analytical clarity, it is important to determine the manner in which plaintiffs have attempted to demonstrate the municipal custom or policy. One way to establish official policy is to show that the deprivation results from the execution of a policy put in place by high level officials such as "lawmakers or *** those whose edicts or acts may fairly be said to represent official policy." (*Monell*, 436 U.S. at 694, 56 L. Ed. 2d at 638, 98 S. Ct. at 2037-38.) Where the conduct of high level officials responsible for establishing policy causes the deprivation, municipal policy is conclusively established without a showing of repeated instances of similar conduct. *Pembaur v. City of Cincinnati* (1986), 475 U.S. 469, 480-81, 89 L. Ed. 2d 452, 463, 106 S. Ct. 1292, 1299.

Where the conduct of high level officials is not implicated, plaintiffs must establish municipal fault through "custom" or "inadequate training." In order to establish a particular custom, a plaintiff must show a practice is so settled and widespread that policymaking officials can be said to have either actual or constructive notice of the practice. (See *Bordanaro v. McLeod* (1st Cir. 1989), 871 F.2d 1151, 1156-58.) Therefore, it is necessary to show that the conduct has been repeated with the apparent acquiescence of policy makers. Where the plaintiff attempts to establish that the deprivation was caused by a policy of inadequate training, the deficiency must be the "moving force" behind the deprivation and

amount to "deliberate indifference" to the rights of the persons that the police come into contact with. *City of Canton v. Harris* (1989), 489 U.S. 378, 389, 103 L. Ed. 2d 412, 427, 109 S. Ct. 1197, 1205.

Plaintiffs cannot establish that Officer Horka's gender discrimination was caused by any policy put in place by high ranking policymakers. Officer Horka is not a high ranking policymaker whose edicts represent municipal policy. Moreover, the policy of strip searching only women, even if meeting the requirements of an official policy, was not the "cause" of Officer Horka's conduct. In order for a policy to be the cause of the deprivation, there must be an "affirmative link between the policy and the particular constitutional violation involved." (*City of Oklahoma City v. Tuttle* (1985), 471 U.S. 808, 823, 85 L. Ed. 2d 791, 804, 105 S. Ct. 2427, 2436.) While we acknowledge that the strip-search policy and the alleged conduct of Officer Horka were both forms of gender discrimination, Officer Horka was not attempting to strip search Jane when the alleged constitutional deprivation took place. Therefore, plaintiff cannot show a municipal policy put in place by a high ranking official caused the deprivation of her rights.

Similarly, plaintiffs' allegations are insufficient to impose municipal liability based on a failure to train. The only allegation relating to failure to train is that Calumet City failed to institute a policy to counteract the strip-search policy. Even if this deficiency amounted to deliberate indifference to the constitutional rights of those who came into contact with the police, it was not the "moving force" behind the gender discrimination suffered by Jane. Failure to implement a policy to counteract discriminatory strip searches is simply not closely enough related to be the proximate cause of the gender discrimination suffered by Jane.

As the conduct of policymakers is not implicated and the allegations regarding failure to train are insufficient, plaintiffs must rely on a showing of custom. Plaintiffs have pleaded facts from which a reasonable trier of fact could determine that gender discrimination in general was so settled and widespread that the policymakers had either constructive or actual notice of such conduct. The plaintiffs did not allege one isolated instance of discrimination by one rogue officer. Against the backdrop of the strip-search policy, the alleged discriminatory actions of both Officer Horka and the other officers at the scene provide sufficient allegations that gender discrimination was widespread. Moreover, the complaint charges that Calumet City acquiesced in the discriminatory conduct by failing to either establish an effective policy to counteract the strip-search policy or investigate the charges of discrimination in this case. These allegations were sufficient to prevent the dismissal of the action against Calumet City based on the pleadings.

## Conclusion

Our holdings are summarized as follows. Plaintiffs' count alleging simple negligence towards Betty and John was properly dismissed by the trial court. Plaintiffs' allegations, however, support a cause of action on behalf of Betty and John for willful and wanton misconduct against Officer Horka and Calumet City. Plaintiffs' count brought on behalf of Jane alleging intentional infliction of emotional distress states a cause of action against Officer Horka and Calumet City. Plaintiffs' count alleging gender discrimination states a cause of action on behalf of Jane against Officer Horka in his personal capacity and Calumet City.

For the reasons stated, the judgments of the appellate and circuit courts are affirmed in part and reversed

in part. The cause is remanded to the circuit court for further proceedings.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded.*

JUSTICE HEIPLE, concurring in part and dissenting in part:

I join the majority opinion in all aspects except its ruling on plaintiffs' claim of gender discrimination. Up until it addresses this point, the majority offers a reasoned analysis of what a jury could and could not find when plaintiffs' allegations are taken as true, as we must do when faced with a dismissal on the pleadings.

Courts should recognize that a cause of action does not lie whenever someone is offended by the frictions that occur from day-to-day human contact. Taking plaintiffs' allegations at face value, Jane Doe was subject to language which a sensitive person might have found offensive, but which cannot be the basis for a section 1983 or section 1988 claim (42 U.S.C. §§ 1983, 1988 (1988)).

If asked to summarize the gist of plaintiffs' complaint in this regard, it would be that: Officer Horka raised his voice to plaintiff Jane Doe, he described her as hysterical to his fellow officers, and he asked arguably demeaning questions in an attempt to find out the facts. Calumet City's alleged gender discrimination was committed not from any facts related to plaintiffs' undeniably horrific day in question, but rather from a long-since-ceased policy of strip searching women but not men who were arrested for certain crimes. According to plaintiffs, this induced officers other than Horka to tell distasteful jokes.

The insufficiency of plaintiffs' complaint, however, is best illustrated not by summarizing the allegations, but rather by simply setting them forth. I therefore do so

here, eliminating their many conclusions of law which we need not accept as true. In support of their claim, plaintiffs alleged the following facts:

"34. Defendant HORKA, in questioning JANE, was rude, demeaning, accusatory and raised his voice."

"35. HORKA's questions included: (a) Where is your husband? (b) Do you know the guy? (c) Why would you leave your children in the apartment if there was a strange man there? and (d) Why did you leave your apartment without the key?"

"77. Defendant HORKA, when describing the incident to his commander and/or to other officers arriving at the scene, described plaintiff JANE DOE with phrases such as 'an hysterical woman', 'this girl is freaking out', and 'she's not coherent anymore' and said that he could not understand her."

"78. Several neighbors at the scene, at all times, could fully understand and comprehend what JANE was saying and was concerned about."

"[81]b. That, at least, through August of 1987, the defendant Calumet City had a policy, practice or custom of strip searching females, but not males, who were arrested for non-felony charges without any basis for a belief that the arrestee was concealing a weapon or a controlled substance."

"[81]c. That this policy of strip searching women, as described in ¶81(b), fostered, condoned and institutionalized amongst officers of the Calumet City Police Department the differential treatment of women."

"[81]d. Prior to December 20, 1987, the defendant Calumet City did not act in an effective manner to counteract the previously fostered, condoned and institutionalized differential treatment of women by officers of the Calumet City Police Department."

"[81]e. That defendant Horka was brought up on charges of [the incident in question], however, none of these charges were for gender discrimination or in any way addressed Horka's differential treatment of women. This constituted ratification of Horka's conduct."

"[81]f. That, upon information and belief, several Calumet City officers (not defendant HORKA) at the scene

on December 20, 1987 made blatantly sexist jokes regarding plaintiff Jane Doe and the developing situation. These sexist jokes were to the effect of 'what would you expect from a woman' and 'isn't it just like a woman' to be in a situation like the one at hand. None of these officers were brought up on charges or reprimanded for these comments, which similarly ratified their conduct."

The fourteenth amendment does not guarantee that a student of Emily Post or Amy Vanderbilt will arrive at the scene when one calls the police for assistance. Section 1983 does not provide a cause of action whenever a word or phrase is spoken which happens to be on the current list of politically incorrect utterances. Neither the Constitution nor the Federal statutes require officers to speak tactfully or deferentially to a person because of his or her gender.

Because I believe that finding a cause of action for gender discrimination on the pleadings filed by plaintiffs is untenable and, indeed, wholly ridiculous, I dissent from that portion of the majority's ruling. I join the balance of an otherwise well thought out and presented opinion.

CHIEF JUSTICE BILANDIC joins in this partial concurrence and partial dissent.