# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-4358

SHERRY FRANCISKI, and CHRISTOPHER EVANAUSKAS,
Individually, and as Parents, Legal Guardians, and
Next Friends of KEEGAN M. EVANAUSKAS, Deceased,

*Plaintiffs-Appellants,*

*v.*

UNIVERSITY OF CHICAGO HOSPITALS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 C 510—**Theresa L. Springmann**, *Judge.*

ARGUED JUNE 3, 2003—DECIDED AUGUST 1, 2003

Before FLAUM, *Chief Judge*, and BAUER and EVANS,
*Circuit Judges*.

BAUER, *Circuit Judge.* Plaintiffs Sherry Franciski and
Christopher Evanauskas filed a four-count complaint
against the University of Chicago Hospitals (UCH), alleg-
ing Intentional Interference with the Parent-Child Rela-
tionship, Intentional Infliction of Emotional Distress, False
Imprisonment, and Defamation, for events surrounding
the death of their infant son, Keegan Evanauskas. The
district court granted summary judgment in favor of

UCH on all four claims, and the parents appeal only with respect to their claims for Intentional Infliction of Emotional Distress and Defamation. We affirm.

## BACKGROUND

Keegan Evanauskas was born on June 20, 2000, at Community Hospital in Munster, Indiana. Keegan was immediately flown to UCH and placed in the Neonatal Intensive Care Unit (NICU) because doctors diagnosed him with a congenital diaphragmatic hernia (CDH), a condition in which the abdominal contents protrude into the diaphragm. As a result of his CDH, Keegan's left lung did not fully develop in the womb and was only the size of a nickel, necessitating the use of a ventilator and a tracheostomy tube to help him breathe. Doctors also diagnosed Keegan with reflux esophageal disease and an obstruction of the superior vena cava, the principal vein that drains blood from the upper body.

During the first few months of his life, Keegan underwent several operations to correct his ailments. In particular, doctors inserted a gastric tube ("G-tube") into Keegan's stomach so that he could be fed directly through it, because normal bottle feeding created a risk of aspiration. He required fourteen different medications that were administered through his feeding tube or intravenous sites in his head, arms, and legs.

Keegan spent the first seven months of his life at UCH until he was released to his parents' care in January 2001. Prior to his discharge, UCH arranged for the provision of medical equipment necessary to support Keegan at home, and for part-time, home nursing care, because his parents both worked during the day. During the month Keegan was home, he was readmitted to the hospital on two different occasions, the first in late January 2001 when Keegan swallowed water from his ventilator

tube. Franciski dialed 911 and an ambulance rushed Keegan to the emergency room. At the emergency room, Franciski became so upset with the doctors' decision to insert an intravenous line into Keegan that she left the hospital. Her behavior that day caused hospital staff to report Franciski to Indiana Child Protective Services (ICPS), stating that she had been combative and verbally abusive while in the emergency room.

Keegan's second hospitalization occurred shortly thereafter, also in late January 2001. On this occasion, the nurse providing part-time home care told Franciski that Keegan did not look well and should probably be taken to the hospital. Franciski, however, left the home to run errands. After she had returned, Keegan stopped breathing and was rushed back to the hospital. Following this incident, the nursing agency reported Franciski to ICPS for refusing to take Keegan to the hospital. During his second hospitalization, doctors discovered a blood infection and he was readmitted to the Pediatric Intensive Care Unit (PICU) at UCH in early February 2001, where he remained until his death on June 8, 2001.

While Keegan was hospitalized at UCH his parents' relationship with hospital staff was troubled. On numerous occasions during his stay in the NICU, Franciski raised her voice with personnel, had a speech and swallowing therapist removed because the therapist would not allow Franciski to bottle feed Keegan (though such feeding created a risk of fatal aspiration), told one of Keegan's doctors to "get lost," complained about the cost of hospital parking and telephone calls to the NICU, and complained when Keegan's circumcision and G-tube placement surgeries were delayed in order to accommodate more urgent needs of other children.

Franciski's behavior did not improve when Keegan was readmitted to the PICU in February 2001. She com-

plained when residents and fellows cared for Keegan and also when certain nurses were not assigned to him. Both parents yelled and used profanity with Keegan's nurse care manager, Lynn Meyrick, and Evanauskas called one of Keegan's nurses a "bitch" when she refused to let him examine Keegan's medical chart without a physician present.

This poor behavior, however, culminated over Memorial Day weekend on May 28, 2001. After returning from a family vacation, Franciski and Evanauskas arrived at UCH between 1:00 p.m. and 1:30 p.m. Upon their arrival, they claimed that Keegan was not properly positioned in his bed, that curdled milk was in his G-tube, that his diaper was wet, that his tracheostomy tubes were twisted, that he had not been bathed all day, and that his toys, books, and bed linens were all over his bed. According to the mother of another child in the PICU, Keegan's parents "just started going off," becoming very loud and using profanity to the point that one mother removed her child from his ventilator and took the child out of the room.

Franciski prepared a bath for Keegan and disposed of his wet diaper and G-tube cannister. They repositioned Keegan on the bed and removed his bed linen before Mary Strenski, the charge nurse on duty that day, arrived in the PICU. Strenski had been informed of their behavior by a staff nurse, and as the charge nurse, Strenski was responsible for dealing with any problems as a result of nursing care. Evanauskas asked Strenski where Keegan's nurse was, and Strenski responded that the nurse was on her lunch break.

Franciski then yelled that Keegan looked like "shit" and that there was "shit everywhere." Though Franciski would not let her close enough to check on him, Strenski checked Keegan's chart, which showed that his nurse had changed his diaper prior to going on her lunch break.

Franciski yelled and cursed at Strenski and demanded to see a supervisor. Complying with that request, Strenski called the PICU Medical Director, Dr. Madelyn Kahana, and informed Dr. Kahana that Keegan's parents were very upset. Dr. Kahana sent Bruce Borowski, the Administrator on Call responsible for addressing complaints from patients and their families, to the PICU.

When Borowski arrived and inquired as to the problem, Franciski again stated that Keegan looked like "shit" and the two parents continued to yell and curse. Borowski asked them to calm down so that a civil conversation might take place, and when they refused, he warned them that if they did not calm down security would remove them from the hospital. By this time, a crowd had formed outside, and amidst the screaming, Borowski asked to see Keegan's diaper. Franciski promptly retrieved the soiled diaper from the trash and shoved it in Borowski's face. Borowski again asked them to calm down, but Franciski replied, "I'm not fucking calming down." She then poured the contents of Keegan's G-tube cannister on the floor and stated, "What the fuck are you going to do now?" Strenski phoned hospital security, who arrived and escorted the parents from the premises. As he was leaving, Evanauskas told Borowski, "I'll see you again."

Borowski and Strenski then reported the situation to Dr. Kahana, who had already heard numerous complaints about prior incidents of Keegan's parents' poor behavior, particularly that they were loud, vulgar, aggressive, and hostile with UCH staff. The following day, Dr. Kahana requested that the UCH social worker, Lisa Kuntz, contact ICPS and request an investigation because doctors believed that Keegan would be able to return home shortly and Dr. Kahana had reservations

about his parents' ability to control their anger.[1] Kuntz also learned that hospital administration had decided to prohibit the parents from visiting Keegan until a conversation about proper behavior had taken place.

Kuntz contacted both parents to schedule a meeting about proper behavior, but they repeatedly refused to meet. On June 5, 2001, they were allowed to visit Keegan with a security escort for one-half hour, though the nurse on duty allowed them to stay for a full hour, because Keegan's health had deteriorated unexpectedly. During this visit, Evanauskas attempted to photograph Keegan to document his condition, but security confiscated the camera until the visit concluded. On June 6, 2001, despite the parents' refusal to meet with hospital personnel about their behavior, UCH lifted all visiting restrictions.

On June 8, 2001, Meyrick called Franciski at approximately 9:00 a.m. and informed her that Keegan was not doing well and that she should come to the hospital immediately. Franciski arrived shortly after 10:30 a.m., but she was too late; Keegan had passed away shortly before she arrived.

The Plaintiff-Appellants then filed a four-count complaint in the district court alleging the following: 1) that UCH directly and intentionally interfered with the relationship between them and Keegan and deprived them of the care, custody, companionship, and society of their son; 2) that UCH acted in an extreme and outrageous manner and intended to inflict severe emotional distress on them; 3) that UCH falsely imprisoned Keegan when it failed to discharge him; and 4) that UCH defamed them by

---

[1] ICPS conducted an investigation but ultimately determined that the claim was "unsubstantiated," and by June 4, 2001, Keegan's caseworker had informed UCH personnel that Keegan could be sent home as soon as he was medically ready.

reporting them to ICPS and that act caused them shame, humiliation, indignity, and loss of good name and reputation. UCH filed a motion for summary judgment on all four counts, which the district court granted in its entirety. Only the district court's decision with respect to their claims for Intentional Infliction of Emotional Distress and Defamation was appealed.

## ANALYSIS

We review de novo the district court's award of summary judgment in favor of UCH, drawing all reasonable inferences and construing all facts in a light most favorable to the Appellants. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 805 (7th Cir. 1999). Summary judgment is proper if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c) (2003). Appellants argue that the district court erred by determining: 1) that UCH's conduct was not sufficiently extreme or outrageous as to the claim for Intentional Infliction of Emotional Distress (IIED); and 2) that the Appellants did not rebut an Illinois statutory presumption of good faith, running in favor of Dr. Kahana, for reporting suspected child abuse with respect to their claim for Defamation. The parties do not argue over the existence of genuine issues of material fact but provide only questions of law.

Under Illinois law, to state a claim for IIED a party must show that: 1) the defendant's conduct was extreme and outrageous; 2) the defendant intended to inflict severe emotional distress, or knew there was a high probability its conduct would do so; and 3) the defendant's conduct caused severe emotional distress. *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994). "Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particu-

lar case." *Id.* at 507. In particular, the Illinois Supreme Court has noted three factors used to evaluate the alleged outrageousness of a defendant's conduct. First, the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Second, and in conjunction with the first consideration, courts must consider whether the defendant reasonably believed its objective was legitimate. *Id.* at 810. Finally, courts must consider whether the defendant was aware the plaintiff was "peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Id.* at 811. The Illinois Supreme Court also provided the following guidance: "We do not mean to imply that these considerations are exclusive, however, nor do we mean to imply that any or all of these factors are necessarily critical to a cause of action for [IIED]." *Id.*

Appellants argue that the district court did not properly weigh the first and third *McGrath* factors in their favor; they do concede, however, that UCH's goal of protecting its patients and staff from their disruptive outburst was legitimate. We cannot agree. First, the rules of UCH with respect to their ability to visit Keegan must be considered in conjunction with UCH's legitimate need to maintain order within its halls, particularly in a department like the PICU where the patients are so fragile. Keegan was not the only child in the room when his parents began to yell and curse at hospital staff. In fact, he was one of seven or eight babies in the room, and his parents' behavior caused one mother to remove her child from a ventilator and retreat to the hallway, where presumably she felt safer. Nor was this the first such outburst. Dr. Kahana noted that over the course of Keegan's hospitalization at UCH, she had received numerous complaints from staff about the aggressive and inconsiderate behavior of his parents. We find that any distress

caused by UCH's apparent power over them was outweighed by UCH's legitimate efforts to maintain order in the PICU by removing them when they refused to calm down. They also submit that they were particularly susceptible to emotional distress because of Keegan's precarious situation and that UCH was obviously aware of this susceptibility and acted outrageously by depriving them of visitation during Keegan's final days. While we would not wish their emotional ordeal on any parent, we note that, at the time of the Memorial Day incident, doctors believed Keegan could be discharged soon. No one was aware that in only a little over a week he would take a turn for the worse and pass away. Furthermore, the hospital repeatedly contacted them and requested a meeting to discuss proper behavior, which they steadfastly refused to attend. UCH allowed them to visit Keegan on June 5, 2001, with a security escort, and even doubled the length of the scheduled visit. On June 6, despite the Appellants' refusal to meet, UCH lifted all visiting restrictions when it became clear that Keegan would not have much longer to live.

UCH owes a duty to its patients to provide proper medical care, and maintaining a sound and safe environment in the PICU is essential to fulfilling that duty. UCH has every right to request that visiting family members observe a sense of decorum in its facility, even when they are dissatisfied with the care accorded a loved one. When family members refuse to act responsibly, as Keegan's parents did here, UCH has the right and obligation to quell any disturbance. Despite Keegan's delicate condition, we cannot say that UCH acted in an extreme and outrageous manner.

Next, the Appellants argue that the district court improperly determined that they failed to rebut the good-faith presumption accorded reporting physicians under the Illinois Abused and Neglected Child Reporting Act, there-

by terminating their claim for Defamation. Under Illinois law, "[a]ny physician . . . having reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child shall immediately report or cause a report to be made . . . ." 325 ILL. COMP. STAT. 5/4 (2003). The statutory definition of "abused child" contemplates the risk of future harm to the child, such that the statute applies in situations where no direct evidence of previous abuse exists but a physician fears for the future safety of the child. 325 ILL. COMP. STAT. 5/3 (2003) ("'Abused child' means a child whose parent . . . creates a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function."); *In Interest of M.K.*, 649 N.E.2d 74, 79 (Ill. App. Ct. 1995).

Any physician "participating in good faith in the making of a report or referral . . . shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such actions." 325 ILL. COMP. STAT. 5/9 (2003); *Lehman v. Stephens*, 499 N.E.2d 103, 111 (Ill. App. Ct. 1986) ("In light of the substantial State interest in uncovering child abuse or neglect, and in protecting the children of this State, we find that the 'good faith' immunity provided for mandated and permitted reporters under the Act is clearly justified . . . ."). While the statutory presumption of good faith is rebuttable, the party seeking to rebut the presumption must present evidence "sufficient to support a finding of the nonexistence of the presumed fact." *Lehman*, 499 N.E.2d at 112 (internal quotations omitted). In other words, the Appellants must offer evidence that tends to show Dr. Kahana reported them to ICPS in bad faith—a showing they simply cannot make. They argue that Dr. Kahana did not have "reasonable cause" to report them to ICPS and that the timing of the

report (following the Memorial Day incident) was retaliatory. To the contrary, although Dr. Kahana's decision to report them did come on the heels of their Memorial Day outburst in the PICU, it also followed long-standing complaints from UCH staff about their similar behavior on prior occasions. Dr. Kahana noted that Keegan was a medically complex child in need of constant care and attention—something parents quick to "fly off the handle" might be ill equipped to perform.[2]

The Appellants argue that Dr. Kahana made the report without any affirmative evidence of abuse, such as an injury, and that they loved Keegan. As we noted above, however, Illinois law adequately contemplates the possibility of future abuse, the risk which Dr. Kahana foresaw in Keegan's case. And finally, as the *Lehman* court noted, statements regarding parents' "love and concern for their child, while hopefully correct, are irrelevant to the precise inquiry presented." *Id.* at 113-14. Given their behavior over the several months that Keegan was hospitalized at UCH, and in particular the Memorial Day incident, Dr. Kahana had reasonable cause to report them in good faith to ICPS.

Accordingly, the district court properly awarded summary judgment to UCH.

AFFIRMED.

---

[2]  In the one month Keegan had been sent home in late January 2001-February 2001, he was hospitalized twice and both incidents led to separate reports by medical professionals regarding Franciski's behavior. Though Dr. Kahana was apparently not aware of these reports when she asked Kuntz to file a report, they nonetheless demonstrate that other medical professionals shared a similar assessment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*